```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------X
UNITED STATES OF AMERICA,

        -against-                        ORDER
                                         02-CR-0728(DRH)(ETB)
DEMETRIUS HILL a/k/a
CAPONE a/k/a MEECHIE HILL,

           Defendant.
-----------------------------X
A P P E A R A N C E S:

For the Government:
    Benton J. Campbell
    United States Attorney
    Eastern District of New York
    Alfonse M. D'Amato Federal Courthouse
    One Federal Plaza
    Central Islip, New York 11722
      By: Richard P. Donoghue, A.U.S.A.

For Defendant:
    Demetrius Hill, Pro Se
    Reg. # 68133-053
    F.C.I. Talladega
    P.O. Box 1000
    Talladega, AL  35160
```

HURLEY, District Judge

Demetrius Hill ("Hill" or "defendant") seeks a new trial, pursuant to Federal Rule of Criminal Procedure 33, citing newly discovered evidence.

## BACKGROUND

Hill was convicted, following a jury trial, of possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1), conspiring to commit robberies of narcotics traffickers in violation of 18 U.S.C. § 1951(a), and one count of robbery of narcotics traffickers in violation of 18 U.S.C. §

1951(a). His convictions were affirmed by summary order dated May 27, 2008. During the pendency of his appeal, he filed a "Motion to Vacate [his] Conviction" (June 18, 2007 Motion to Vacate Conviction ("Def.'s Mot.") at unnumbered p. 1)), to be later supplemented by a non-materialized "memorandum of law in support" (id. at ¶ 12).

## SUMMARY OF TRIAL EVIDENCE

The trial evidence, as accurately synopized by the government, includes

> At trial, the government presented the testimony of three cooperating defendants (Sarah Guzman, Daniel Skillings, Omar Eutsey) who committed robberies of drug dealers with Hill, a series of law enforcement officers who described seizing the charged firearm from Hill and numerous admissions he made about the firearm and robberies, and an inmate who was housed with Hill and to whom Hill had disclosed detailed information relating to the firearm possession and the robberies. The Government also presented the testimony of Cynthia Plummer [discussed infra]. The Government also presented physical evidence, including the firearms seized from Hill and Guzman on February 13, 2002, Hill's personal items seized from a truck used to commit the robberies, business records, including telephone and hotel records corroborating the cooperators, and a recording of a telephone conversation between Plummer and Hill wherein Hill made reference to the fact that he was robbing drug dealers. (Trial Tr. 1144-74). Detective Mercado, who interviewed Hill following his arrest for firearm possession on February 13, 2002, testified that Hill admitted robbing drug dealers in New York and New Jersey with Michael Skillings and others and stated, "I don't know what you're worried about. All

>   > I'm doing is robbing drug dealers." (Trial
>   > Tr. 131). Detective LaVelle, who also
>   > interviewed Hill that day, testified that, in
>   > describing the activities of his robbery
>   > crew, Hill stated, "We only robbed drug
>   > dealers." (Trial Tr. 114). Guzman,
>   > Skillings, Eutsey and Plummer were each
>   > subjected to vigorous cross-examination.
>   >
>   > In his own defense, Hill testified that he
>   > did not possess the charge firearm and did
>   > not commit any robberies with Guzman or the
>   > other two co-conspirators who testified
>   > against him. He further testified that he
>   > did not make any admissions about the firearm
>   > or robberies to the various law enforcement
>   > officers who testified against him and
>   > claimed that virtually all of the Government
>   > witnesses were lying. (Trial Tr. 947-1110).
>   > On cross-examination, Hill admitted, <u>inter
>   > alia</u>, that he had recruited a witness to
>   > commit perjury in one of his prior criminal
>   > prosecutions. (Trial Tr. pp. 1046-47).
>
> (Gov't's Sept. 4, 2007 Letter Br. ("Gov't's Br.") at 7.)

<u>APPLICABLE LAW</u>

Federal Rule of Criminal Procedure 33 provides in pertinent part:

> Upon the defendant's motion, the court may
> vacate any judgment and grant a new trial if
> the interest of justice so requires. . . .
> If an appeal is pending, the court may not
> grant a motion for a new trial until the
> appellate court remands the case.

Fed. R. Crim. P. 33.

In deciding whether to grant a motion for a new trial under Rule 33, the test is "whether 'it would be a manifest injustice to let the guilty verdict stand.'" <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir. 1992)(quoting <u>United States</u>

-3-

v. Reed, 875 F.2d 107, 114 (7th Cir. 1989)). Before ordering a new trial under Rule 33, a district court must find that there is "a real concern that an innocent person may have been convicted." Id.; see also United States v. Morales, 902 F.2d 604, 606 (7th Cir. 1990)(Posner, J.)(describing order of new trial as a response to "a serious danger that a miscarriage of justice has occurred — that is, that an innocent person has been convicted"); United States v. Thomas, 894 F. Supp. 58, 63 (N.D.N.Y. 1995)(district court should only grant a new trial "when it 'concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred'")(quoting United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)). A trial court's discretion under Rule 33 "should be exercised sparingly." Sanchez, 969 F.2d at 1414.

Motions for a new trial based upon claims of newly discovered evidence are "not favored and should be granted only with great caution." United States v. Costello, 255 F.2d 876, 879 (2d Cir. 1958)(citing United States v. Johnson, 327 U.S. 106 (1946)). Such motions are to be granted "only 'in the most extraordinary circumstances.'" United States v. Imran, 964 F.2d 1313, 1318 (2d Cir. 1992)(quoting United States v. DiPaolo, 835 F.2d 46, 49 (2d Cir. 1987)). To prevail on a Rule 33 motion

-4-

based upon claims of newly discovered evidence, a defendant must demonstrate that the new evidence could not with due diligence have been discovered before or during trial and "that the evidence 'is so material and non-cumulative that its admission would probably lead to an acquittal.'" United States v. Gallego, 191 F.3d 156, 161 (2d Cir. 1999)(quoting United States v. Siddigi, 959 F.2d 1167, 1173 (2d Cir. 1992)(quoting United States v. Alessi, 638 F.2d 466, 479 (2d Cir. 1980))). Additionally, any information purportedly constituting "new evidence" must itself be admissible at trial. United States v. Parker, 903 F.2d 91, 103 (2d Cir. 1990).

Defendants alleging government witness trial perjury in a Rule 33 motion must demonstrate that the witness' testimony was actually false and "that 'the jury probably would have acquitted in the absence of the false testimony.'" United States v. Moore, 54 F.3d 92, 99 (2d Cir. 1995)(quoting Sanchez, 969 F.2d at 1413-14; United States v. White, 972 F.2d 16, 20 (2d Cir. 1992). The Second Circuit has held that "in the rare instance where it can be shown that the prosecution knowingly used false testimony . . . we would apply a less stringent test and permit the granting of a new trial where the jury 'might' have acquitted absent the perjury." Sanchez, 969 F.2d at 1414 (citing United States v. Stofsky, 527 F.2d 237, 246 (2d Cir. 1975)). Perjury claims based upon recantation by the witness are "looked upon with the utmost

suspicion." DiPaolo, 835 F.2d at 49 (quotation marks and citations omitted).

PURPORTED NEWLY DISCOVERED EVIDENCE ADVANCED BY DEFENDANT

1.  Governments Alleged Threatening of Prospective Defense Witness Bernard Freeman

> Defendant states that he has
>
> recently become aware (recently) that someone from the ATF (probably the case agent Becci in petitioner's prosecution) upon learning that petitioner intended to call Bernard Freeman as a defense witness; went to the Suffolk County Jail to visit him. Then proceeded to threaten Freeman with federal prosecution of his state case if he testified favorably for petitioner. Rather than refuse to testify "Freeman" was instructed to <u>change</u> his story (testimony) so that his allegations would be outside the time frame of petitioners charged conspiracy. Moreover, Freeman, was extremely reluctant to take the stand on petitioners behalf. Prior, to calling Freeman, petitioner had spoke to him about the nature of petitioners charges, and he agreed to testify on petitioners behalf. He stated that he would be willing to testify to the fact that M. Skillings[1] had robbed him on at least two occasions and in the early winter of 2001 and that him and M. Skillings had been involved in an ongoing feud of which petitioner had never taken part in, yet M. Skillings had robbed him with other individuals a female included, and petitioner was not present on any occaisions. Further, and more essential, is that the subpeona for "Freeman" was discussed outside the presence of the jury, and at a sidebar at the bench, and ATF agent Becci was not

---

[1] M. Skillings' first name was "Michael." He was killed in February 2002 and was government's cooperating witness Daniel Skillings' brother.

> present, so that AUSA Donohue would have had
> to have told Becci and instructed her to go
> to the Jail to see Freeman and influence his
> testimony.

(Def.'s Mot. ¶¶ 6 and 7 (quoted verbatim, absent any editing).)

The colloquy at sidebar referenced by defendant in the last paragraph of the above quoted excerpt from his application was:

> DEFENSE COUNSEL: I spoke briefly with Mr.
> Freeman who tells me that he has information
> that I believe would be helpful to,
> conceivably be helpful to Mr. Hill, in
> connection with his dealings with Michael
> Skillings. "His" meaning Mr. Freeman's
> dealings with Michael Skillings. However, he
> says those dealings occurred between June of
> 2001 and August of 2001 and that he had no
> further dealings with Michael Skillings after
> that date. And in fact he, Freeman, went to
> jail himself, was arrested on November 6,
> 2001. Now, to the extent that the indictment
> in this case charges my client with a robbery
> conspiracy that starts in October of '01 and
> runs to February of '02, my initial reaction
> to the proffer by Mr. Freeman is that it's
> outside the scope of the conspiracy and
> therefore I didn't really see how the Court
> would, whether or not the Court would permit
> it. My client feels strongly that
> notwithstanding that it's outside the
> parameters of the charged conspiracy, that to
> the extent that there are no specific dates
> and times in the charged conspiracy itself,
> that Michael Skillings' activities prior to
> the commission of the crime . . . is part of
> this current charge. . . .
> \* \* \*
> THE COURT: And this is relevant to what?
>
> DEFENSE COUNSEL: To whether or not Mr. Hill
> was in any manner, shape or form connected
> with Mr. Skillings during that period of
> time.

> THE COURT: During the time period of June of 2001 through August of 2001?
>
> DEFENSE COUNSEL: That would be right. . . .
>
> THE COURT: Is there evidence in this case that would suggest during the time frame that Mr. Freeman would testify about that Mr. Hill was engaged in the activities which are charged in the indictment at a later time?
>
> DEFENSE COUNSEL: I don't believe so, Your Honor.
>
> THE COURT: I don't see the relevance. If there's something further, fine. But I mean based upon what I've been told, its interesting but irrelevant.
>
> DEFENSE COUNSEL: That was my analysis. But I communicated that to my client.
>
> THE COURT: Over the defense's objection, based upon the proffer that has been made, Mr. Freeman will not be permitted to testify on the grounds he has [no] relevant information to present to this jury.

(Gov't's Br. at 4-5, quoting from the Trial Tr. 864-67.)

Primarily, it warrants mention that defendant does not specifically indicate when the claimed information came to his attention nor the source of such information. Also absent is an affidavit from the purported source, or other evidence in an admissible format. See United States v. Wall, 389 F.3d 457, 470-71 (5th Cir. 2004); United States v. Parker, 903 F.2d 91, 102-03 (2d Cir. 1990). But beyond those procedural shortcomings, that Mr. Skillings may have robbed Mr. Freeman, assisted by others, either between June and August of 2001 (as per Freeman as

-8-

reported by Hill's counsel at sidebar) or in the "early winter of 2001" as per Hill (Def.'s Mot. ¶ 6), and that defendant was not among the robbers, is clearly substantively insufficient to warrant the relief requested.  The government has never suggested that defendant participated in every robbery Michael Skillings committed.  Which is to say, as noted by the government "[e]stablishing that Michael Skillings and others robbed Mr. Freeman simply does nothing to contradict the overwhelming evidence that Hill and his co-conspirators carried out other robberies."  (Gov't's Br. at 10.)  Moreover, as observed by the government and not contradicted by defendant in his reply submission, the evidence indicates that Freeman "was incarcerated starting on November 6, 2001" (id. at 9), thus undermining the claim that Freeman was robbed by anyone, unless inside the correctional facility, in "early winter 2001."  (Def.'s Mot. at ¶ 6); see also defense counsel's previously quoted statement at sidebar that "he, Freeman, went to jail himself, was arrested on November 6, 2001".)

Similarly dubious is Hill's assertion that Assistant United States Attorney Donoghue "instructed" an agent "to go to the jail to see Freeman and influence of his testimony" after defense counsel at sidebar broached the possibility of calling Freeman as a witness and provided a synopsis of his anticipated testimony.  (Def.'s Mot. ¶ 7.)  The agent's assignment, as

posited by defendant, was to persuade Freeman "to change his story [presumably from being robbed in the early winter of 2001 to being so victimized between June and August 2001] so that his allegations would be outside the time frame of the charged conspiracy [i.e. "between October 2001 and February 13, 2002," Superceding Indictment, ¶ 2]. (Def.'s Mot. ¶ 6.) However, that notion makes no sense given that defense counsel reported during the subject sidebar (1) that Freeman told him that his interaction with Michael Skillings occurred between June and August of 2001 and not thereafter, and (2) that Hill believed that even though the crimes against Freeman occurred outside the parameters of the charged conspiracy the information was, nonetheless, germane.[2]

In sum, defendant's application "based on newly discovered evidence that federal agents went to see and influence Bernard Freeman at the Suffolk County jail just prior to him being subpoenaed to testify on petitioner's behalf" (id., ¶ 12) is both procedurally and substantively flawed for the reasons

---

[2] The Court recognizes that the government perceives the gravamen of defendant's complaint as being its contacting Freeman "prior to trial" rather than after a sidebar conference during trial. (Gov't's Br. at 5.) Granted, the temporal aspect of the complaint is not free from doubt. Nonetheless, my reading of defendant's motion — based primarily on his supposition that "AUSA [Donoghue, who was at the sidebar] would have had to have told Becci [who was not at sidebar, of the subpoena for Freeman] and instructed her to go to the jail to see Freeman and influence his testimony" (Def.'s Mot. ¶ 7) — lead me to conclude that the Court's understanding dovetails with defendant's intent.

indicated.

2. Government's "Secret Deal" to Dismiss a Charge Pending Against Cynthia Plummer in Exchange for Her Falsely Implicating Defendant in Criminal Conduct

Defendant describes his newly discovered evidence regarding Cynthia Plummer thusly:

> [the government] called her job, and had her threatened so that she wouldn't bail petitioner out by signing on his behalf. Then several agents went to interview her at her job and when she failed to implicate petitioner in any crime, the government then charged her with obstruction of justice – because they claimed she lied to them; upon arrest she then implicated petitioner, in criminal conduct in a affidavit (she was arrested just several days prior to petitioners trial)  She then was compelled to testify against petitioner at trial to the "new" version, and after said testimony her case was summarily dismissed . . . . . Cynthia plummer has told petitioner in a phone conversation, from the MCC in Oct. Nov. of 2006 on an unmonitored call,[3] that she "is sorry and that the government threated her with prison if she did not (lie) for them, and guaranteed her no prison time or conviction if she testified in accordance with her new affidavit and that her case would be dismissed."  In sum inter alia.  She also related that ATF Becci, coached her along in her statement and said the government wouldn't oppose her bail application as long as she cooperated fully with the government and its prosecution.  Her case was subsequently dismissed after

---

[3] The government questions the accuracy of defendant's representation that the subject telephone was unmonitored. (Gov't's Br. at 9 n.5 ("As Hill was not representing himself pro se during the time frame cited, BOP procedures would have prohibited him from having unmonitored telephone calls with anyone but his defense counsel.").)

-11-

>           petitioners conviction.
>
>                    . . . .
>
>           Cynthia Plummer is scared to provide an
>           affidavit to petitioner for fear she may be
>           re-prosecuted.  However, the fact that her
>           case was in fact dismissed in conjunction
>           with her wavering testimony on cross
>           examination at trial give credence that she
>           was in fact coersed and the secret deal did
>           exist.

(Def.'s Mot. ¶¶ 9, 10, 11 & 12 (quoted verbatim absent any editing).)

Plummer testified pursuant to a grant of immunity that she was the defendant's live-in girlfriend during 2001 - 2002, that she saw him in possession of the 38 caliber revolver charged in Count One of the Indictment, that she stayed in a hotel in Camden, New Jersey with the defendant, his co-conspirators, and others in February 2002, and that she heard the defendant and co-conspirators bragging about committing various crimes, and that she repeatedly lied to law enforcement authorities to protect the defendant.  (Trial Tr. at 304-18, 527-67.)  Her testimony "was detailed, consistent, and , of course,] under oath," as well as credible to me as the trial judge.  United States v. DiPaolo, 835 F.2d 46, 50 (2d Cir. 1987).

Here, unlike with Freeman, defendant reports that he actually spoke directly to Plummer after his trial.  But tellingly defendant never identifies specifically the false information that Plummer supposedly imparted to the jury.

Granted, defendant maintains that Plummer told him that "the government threatened her with prison if she did not (lie) for them." (Def.'s Mot. ¶ 10.) But the fact that the word "lie" is in parenthesis presumably means that she didn't use that word but that it is his conclusory characterization of what she said. (Def.'s Mot. ¶ 10.) The basis for that characterization by Hill remains, however, unarticulated. The thought that she lied across-the-board, if that is what defendant means to imply, seems farfetched because, inter alia, major portions of her testimony dovetailed convincingly with other solid evidence in the case. In any event, since the sine qua non of a new trial application based on perjured testimony is a meaningful identification of the targeted testimony, the lack of specificity in defendant's application counsels its denial, Cf. United States v. White, 972 F.2d 16, 20 (2d Cir. 1992)("[W]hen the newly discovered evidence focuses on the perjury of a witness, a threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury.")

With respect to defendant's complaint about Plummer being arrested shortly before his trial, that information was presented to the jury. As she explained during her trial testimony, she was a corrections officer in the Nassau County Sheriff's Department when she met the defendant and had been since 1991. When she was contacted by state and federal agents

-13-

during the investigation of Hill, she deliberately provided false information, to wit denying that she had been "in New Jersey" at a particular time (Trial Tr. at 306), and saying that she "didn't know Demetrius had [her red Jeep]" (id.) which she had reported as "stolen" (id. at 309). As a result, she was charged with "giving a false statement to law enforcement" in violation of "[f]ederal" law. Id. at 303. She testified that she lied to "protect[] Demetrius," id. at 307. That decision ultimately cost her her job. Which brings us to defendant's claim that the government had "a secret deal to dismiss Cynthia Plummer's case in exchange for her testimony . . . implicating him in criminal conduct." Def.'s Mot. ¶ 12. It is undisputed that the charge against Plummer was dismissed but not under the unsubstantiated scenario proffered by defendant. Instead, as the government indicates and defendant does not contest in his reply:

> In May 2005, months after the trial, the Government and Ms. Plummer reached an agreement regarding the disposition of the charge against her. Pursuant to that agreement, Ms. Plummer resigned her position with the Nassau County Sheriff's Department and successfully completed the Pretrial Diversion Program. Thereafter, the Complaint charging her with making a false statement was dismissed.

(Gov't's Br. at 5-6 n.2; see also Def.'s Reply at 1.)

To partially reiterate, Hill has failed to identify the part or parts of Plummer's testimony which he contends were fabricated. Instead, he insists that her testimony, consisting

of unspecified "lie[s]," Def.'s Mot. ¶ 10, was the product of a "[s]ecret deal," id., ¶ 12, between her and the government. However, the circumstances leading to her arrest and her post-arrest cooperation with the government, uncontroverted except for Hill's unsubstantiated assertions, was neither "secret" in the sense of hidden from the jury nor consistent with a "deal." Indeed, when asked whether she had "any agreement with the government as to how to resolve [her] open case" she replied "no." (Trial Tr. at 304.)

3. Conclusion as to Defendant's Application for a New Trial Pursuant to Fed. R. Criminal P. 33

A juxtapositioning of the reasons that new trials are granted under Rule 33 as set forth in the Applicable Law portion of this opinion, with Defendant's submission, compels the conclusion that the requested relief be, and it hereby is, denied.

## DEFENDANT'S DISCOVERY DEMANDS

Defendant moves, in the alternative to his request for a new trial, for various items of discovery (Def.'s Mot. ¶¶ 2, 3, 4, and 5), together with an "evidentiary hearing concerning Mr. Freeman and Cynthia Plummer" (Def.'s Reply at unnumbered p. 4). These requests will be discussed seriatim.

1. Defendant's Request for Jail Records Indicating All Law Enforcement Personnel Who Visited Bernard Freeman at the Suffolk County Correctional Facility From 2003 to 2006

Relatively short shrift may be made of this request. As previously indicated, defense counsel informed the Court at sidebar that Freeman told him that he had been robbed by Michael Skillings, and others absent Hill, prior to the commencement of the conspiracy charged in Count Two, and of Hill's personal position as to relevance of those earlier robberies.  However, in the present motion, Hill inexplicably takes a different tack, surmising that the information about the pre-conspiracy timing of the Freeman robberies originated not with Freeman as originally reported to the Court by his attorney, but rather is traceable to prosecutorial malfeasance.  Under the circumstances, including the elusive nature of the relevant temporal reference point for the Freeman/Skillings robberies as articulated by and on behalf of defendant, discovery, assuming it is applicable in Rule 33 context, is not called for here.

2. Subpoena Directing Assistant United States Attorney Donoghue to Turn Over All Documentation Pertaining to Plummer Being Permitted to Post Bail Unopposed by the Government, Pertaining to Having her Charges Dismissed and Being Allowed to Resign her Position as a Correctional Officer Rather Than Being Fired, All Supposedly in Return for her Trial Testimony

Defendant cites no authority in support of what the government labels as essentially "a fishing expedition." (Gov't's Br. at 10.)  That label is appropriate here basically for the reasons earlier provided concerning defendant's claim that Plummer provided perjured testimony.  Nothing beyond his

imagination supports his "secret deal" theory. Accordingly, this discovery requests, like its immediate predecessor, is denied.

3. Information Pertaining to Sarah Guzman

As a preliminary matter, defendant does not address whether he "could have discovered the evidence before or during trial," one of the multiple preconditions for a successful Rule 33 application. United States v. Middlemiss, 217 F.3d 112, 122 (2d Cir. 2000). Instead, he simply states he was unaware "prior to trial" that "the government assisted Sarah Guzman [to] enroll in school and obtain a job, . . . did not oppose her being on pretrial supervision . . . [and] assisted [her] in obtaining housing." (Def.'s Mot. ¶ 4.) That failure alone is fatal to defendant's application.

Defendant's submission is also silent as to how such information is "of a sort that could, if believed [by the trier of fact], change the verdict." United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995); see also United States v. Agurs, 427 U.S. 97, 112-13 (1976)("If there is no reasonable doubt about guilt whether or not additional evidence is considered, there is no justification for a new trial.") Not only did the defense have other, and far more significant impeachment evidence against Guzman than that presently under discussion, including her admission that she committed perjury before a Grand Jury, but the government's evidence against Hill from multiple sources

independent of Guzman was overwhelming.

Finally, this discovery request is not tethered to any claim that Guzman testified falsely before the jury. It is, therefore, problematic at best how the requested discovery would tend to advance the ultimate relief sought by defendant, to wit a new trial pursuant to Rule 33. For the reasons indicated, this discovery request is denied.

4. Requested Order That Government be Directed to Produce All Phone Conversations of Omar Eutsey Made From the Nassau County Correctional Facility

If the defendant believed the captioned calls were relevant during trial, he could have had them subpoenaed. Unaddressed in his current application is what has changed from then to now to warrant the requested post-trial discovery. Simply opining that the recorded calls "will show that Omar Eutsey instructed his sister on what to say at trial [and] how to contact the government attorney, inter alia," without even, e.g., a hint as to the basis for such belief, is insufficient.

CONCLUSION

For the reasons indicated, defendant's motion for a new trial or, in the alternative for discovery, is denied.

SO ORDERED.

Dated: Central Islip, New York
       March 4, 2010

_____
DENIS R. HURLEY, U.S.D.J.